UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

KYLE STECHERT, ET AL.,            .      No. 2:17-cv-00784-KSM
                                  .
           Plaintiff,             .
                                  .      United States Courthouse
      v.                          .      601 Market Street
                                  .      Philadelphia, PA 19106
THE TRAVELERS HOME AND            .
MARINE INSURANCE COMPANY,         .      October 25, 2021
ET AL.,                           .      1:10 p.m.
           Defendant.             .
. . . . . . . . . . . . . . . .          (Courtroom 15B)


                        MOTION HEARING
               BEFORE HONORABLE KAREN S. MARSTON
                 UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:          RICHARD M. OCHROCH, ESQ.
                            BRETT N. BENTON, ESQ.
                            ANDREW R. OCHROCH, ESQ.
                            OCHROCH & ASSOCIATES, P.C.
                            318 South 16th Street
                            Philadelphia, PA 19102

                            JAMES ARTHUR BARRY, ESQ.
                            MARC P. WEINGARTEN, ESQ. (Via Video)
                            LOCKS LAW FIRM, LLC
                            801 North Kinds Highway
                            Cherry Hill, NJ 08034

For the Defendant:          BROOKS FOLAND, ESQ.
                            MARSHALL DENNEHEY WARNER COLEMAN
                            & GOGGIN
                            100 Corporate Center Drive, Suite 201
                            Camp Hill, PA 07011

                            MARK L. HANOVER, ESQ. (Via Video)
                            DENTONS US, LLP
                            233 South Wacker Drive, Suite 7800
                            Chicago, IL 60606-6404

```
Audio Operator:        MARK A. RAFFERTY

Transcribed by:        DONNA MORRIS, CET-1284
                       TAMI S. MAYES, CET-547
                       Court Transcriber
                       Lawrence Court Transcription & Video
                       P.O. Box 530790
                       DeBary, FL 32753
                       833-800-LCTV
```

Proceedings recorded by electronic sound
recording, transcript produced by transcription service.

1      (Call to Order of the Court at 1:09 p.m.)

2          JUDGE KAREN S. MARSTON:  Good afternoon, everyone.

3          ALL:  Good afternoon, Your Honor.

4          THE COURT:  All right.  So, can we -- Mark, you think

5  we can move that TV a little bit --

6          THE CLERK:  Sure.

7          THE COURT:  -- because the angle -- because I can't

8  really see them.  Now, I -- yeah.  Yeah.  But that's -- they

9  may still -- can you guys see okay?

10          MR. BROOKS FOLAND:  That's fine, Your Honor.  Yeah.

11          MR. RICHARD M. OCHROCH:  Yes.

12          THE COURT:  All right.

13          MR. OCHROCH:  We also have individual screens, Your

14  Honor.

15          THE COURT:  Oh, they have individual screens.  I

16  get -- I get the whole thing then.

17          (Laughter)

18          THE COURT:  Oh, if I -- oh, okay, that's even better.

19          You may all be seated.

20          Oh, okay.  Great.  We didn't have that last time.

21  Improvements.

22          THE CLERK:  Yes.

23          THE COURT:  Are you on, Mark?

24          THE CLERK:  Yes, Your Honor.

25          THE COURT:  Okay.  All right.  I am calling the case

1  of -- and how do we pronounce it, Stechert?

2          MR. OCHROCH:  Stechert.

3          THE COURT:  Stechert, et al vs. The Travelers Home

4  and Marine Insurance Company, et al.  It is civil docket 17-

5  784.

6          Let me start -- counsel, will you identify

7  yourselves?

8          MR. OCHROCH:  I am Richard Ochroch, Your Honor.  I am

9  co-counsel to the Plaintiff.  Sitting to my right is James

10 Barry, who is also co-counsel.  On the screen is Marc

11 Weingarten, also co-counsel.  Marc and James are from the Locks

12 Law Firm.  My law firm is Richard M. Ochroch and Associates.

13 Behind James Barry is my partner, Brett Benton, who is also co-

14 counsel.

15         THE COURT:  Okay.

16         MR. OCHROCH:  And my colleague and associate, Andrew

17 Ochroch.  And we --

18         THE COURT:  I'm sorry, who is the colleague and

19 associate?

20         MR. OCHROCH:  Andrew Ochroch.

21         THE COURT:  Okay.  Now, is there somebody who is

22 not -- thought they were on the docket that's not on the

23 docket?

24         MR. OCHROCH:  Brett Denton.

25         THE COURT:  Okay.

1        MR. OCHROCH:  Don't know why.  He's been an integral

2   part of the case for five years, but --

3        THE COURT:  Okay.  Well, just make sure he gets added

4   to the docket after today then.

5        MR. OCHROCH:  Okay.  We can do that.

6        THE COURT:  All right.  Counsel?

7        MR. FOLAND:  Good afternoon, Your Honor.  My name is

8   Brooks Foland.  I represent Travelers Insurance along with my

9   co-counsel appearing by -- by video, Mark Hanover, from the

10  Dentons Law Firm out of Chicago.

11       THE COURT:  Okay.  Great.  Thank you.

12       MR. FOLAND:  Thank you, Your Honor.

13       THE COURT:  And counsel on video, it's good to see

14  you.  Thank you for being here.

15       MR. MARC P. WEINGARTEN:  Thank you, Your Honor.

16       MR. MARK L. HANOVER:  Thank you.

17       THE COURT:  Hopefully, we don't have any issues with

18  our technology today, so we'll see.  Sometimes this works and

19  sometimes it doesn't.

20       All right.  So we are here today because this case

21  was transferred to me, and at the time it was transferred to

22  me, I understand that you-all had filed in, I guess, May, if

23  I'm correct -- I think that's correct, a motion for preliminary

24  approval of the class action settlement.  So I'm here today for

25  that hearing.

1             Will you please -- would you like to begin?

2             MR. OCHROCH:  Yes, Your Honor.  Thank you.

3             THE COURT:  All right.  You may.

4             MR. OCHROCH:  May I go to -- to the --

5             THE COURT:  You can or you -- would you feel more

6  comfortable going there or --

7             MR. OCHROCH:  I think so.

8             THE COURT:  -- you're more than welcome to stay where

9  you are.

10             MR. OCHROCH:  Well --

11             THE COURT:  Okay.  That's fine.

12             MR. OCHROCH:  -- it's going to be hard for me to see

13  and hear.  I think this --

14             THE COURT:  Okay.  That's fine.

15             MR. OCHROCH:  -- might make it a little better.  I

16  hope so.

17             Good afternoon, Your Honor, and thank you for

18  scheduling this hearing.  As you have just discussed, we are

19  here for Plaintiff's proposed -- for the unopposed preliminary

20  approval of a class action.  This is a claims made settlement

21  involving approximately 18,000 insureds of Travelers.  This is

22  a case that's lasted five years.  As we set forth in the

23  motion, which I'm not going to repeat in its entirety, we

24  believe that the settlement is fair, reasonable, and adequate.

25             THE COURT:  And I take it the approximately 18,000

1  are throughout the country, is that correct?

2       MR. OCHROCH:  Pennsylvania.

3       THE COURT:  They're only in Pennsylvania?

4       MR. OCHROCH:  Only in Pennsylvania.

5       THE COURT:  Okay.

6       MR. OCHROCH:  And, actually, as part of the

7  settlement as -- as you will see, once you enter the

8  preliminary order, assuming you do, the -- the numbers will be

9  updated by Travelers.  Right now, we have a computer list of

10  Pennsylvania insureds who are subject to the class of

11  approximately 17,250 -- 250.  There will be another -- there

12  will be another run of that data to the date of the preliminary

13  approval, which should take us into the 18, $19,000 range.

14  They will all by -- by this agreement, they will all be part of

15  the class.

16       By way of very brief background, this case arises out

17  of a serious automobile accident Mrs. Stechert was in with her

18  two minor children on January 16th, 2015.  Her car was totaled.

19  She was very seriously injured.  Her two children were not.

20  The family had a Travelers policy.  It was a typical automobile

21  policy with a typical rental clause, which is sometimes called

22  an -- an Extended Transportation Expense clause or an ETE

23  clause.  They invoked that clause and they were given a rental

24  car through Enterprise, who billed Travelers.

25       Significantly, and this is the underlying case, which

1  I'm not going to get into it, because it's in-depth, but the

2  Travelers policy provided that our payment will be limited to

3  that period of time reasonably required to repair or replace

4  your covered auto.  Reasonably required is the operative and

5  important language.  In part --

6          THE COURT:  Up to 30 days, though, right?

7          MR. OCHROCH:  With a maximum 30 days.

8          THE COURT:  The maximum 30 days, which -- or the --

9          MR. OCHROCH:  But -- but that's a policy limitation

10  and there's only one way and one way only for Travelers to

11  provide less than 30 days and that's if they do an analysis and

12  have a conversation as to what's reasonably required.

13          In contradiction to the policy limitation, Travelers

14  issued on January 27th, 2015, a letter that we have called

15  throughout this litigation the rental letter, that I can hand a

16  copy up if you'd like to see it.

17          THE COURT:  Do you have it?

18          MR. OCHROCH:  I do.

19          THE COURT:  It's not part of what -- I don't think I

20  saw that letter.

21          MR. OCHROCH:  It's in the -- it's in the package, but

22  I can --

23          THE COURT:  Oh, it is in the packet?

24          MR. OCHROCH:  Yeah.

25          THE COURT:  Okay.  If it's --

1      MR. OCHROCH:  But I -- I -- I have clean copies,

2  Judge.

3      THE COURT:  Oh, it's the one that says five days?

4      MR. OCHROCH:  Right.  Exactly.

5      THE COURT:  Yeah.  I've seen it.  Yeah.

6      MR. OCHROCH:  And we also have one -- it's a form

7  letter from Travelers.

8      THE COURT:  Right.

9      MR. OCHROCH:  And we have the form, that it's easier

10 to read than the actual letter that Mr. and Ms. Stechert got.

11     THE COURT:  Okay.

12     MR. OCHROCH:  The operative language is that -- and

13 it's the second paragraph from the bottom.  Throughout this

14 process, if your vehicle is determined to be a total loss, your

15 rental will be limited to five days from when your vehicle was

16 deemed non-repairable.  That's a breach of the contract and

17 that started the five years of litigation that -- that brings

18 us here today.  It will be six years in the first week of

19 January.

20     As a result of that clause and as a result of Mr.

21 Stechert not receiving 30 days of rental, he authorized us and

22 we initiated a class action complaint, which is also part of

23 the documents that you have on January 16th, 2007 [sic].

24 Thereafter, in front of Judge Joyner, while we commenced non-

25 class discovery on January 17th, 2018, Travelers filed a motion

1 for summary judgment, which Judge Joyner granted on May 15th,

2 2018.  With Mr. Stechert's permission, we appealed that to the

3 Third Circuit, who overturned that decision on March 15th,

4 2019.  The Third Circuit stated, among other things, that the

5 fI've day limitation is in direct conflict with the limitations

6 specified in the Stechert's policy, which provides for 30 days

7 of coverage in the absence of a determination that it is

8 reasonable for the insureds to obtain alternate transportation,

9 so the case came back to Judge Joyner.

10          We then embarked upon a period of class discovery for

11 about another year.  We took several depositions, exchanged a

12 lot of documents.  We probably reviewed about 14,000 documents

13 altogether, not all of which were Bates stamped, because one of

14 the areas of contention was who the proper defendant should be.

15 Travelers advocated that the only proper defendant was the

16 entity on the Stechert's policy, which was Travelers Home and

17 Marine.  We disagreed and felt that all 28 --

18          MR. JAMES ARTHUR BARRY:  38.

19          MR. OCHROCH:  All 38 Travelers entities that -- that

20 sold similar policies in Pennsylvania were related and one was

21 the alter ego of the other and they should all be the

22 defendants.  That was a point of contention that we had, which

23 we resolved in the settlement proposal which -- which I'll get

24 to shortly.

25          After the last deposition in -- I'm sorry, Judge, my

glasses are -- glasses are fogging, it's making it worse.

On March 13th -- March 13th, 2020, we took the last deposition.  Mr. Hanover and I looked at each other afterwards and said maybe it's time we sit down and we did.  It took a year.  Every -- every aspect of this lengthy settlement in front of you, every word was discussed.  We had two lengthy sessions with Magistrate Judge Welsh.  We spoke to her before the sessions, during the sessions, and after the sessions.  It -- it -- it -- we had a -- we had a -- we had a tough road. That resulted, however, in the agreement in front of you that was signed in -- in -- in May of 2020 -- May of 2021.  It took a year, but it's signed and it's in front of you.

I'd like to go through some of the important parts of the settlement.  As part of the settlement, Travelers has included 18,000-plus Pennsylvania insureds, which is all 38 companies that we argued should be part of the class.  That's a very important part of the settlement talks.  That includes everybody that was subject to the same claims procedures that the Stechert's were.  Some people received the rental letter, some people were just subject to the same claims procedures, which followed the rental letter, and this includes everybody and that's very important to us.

THE COURT:  So all 18,000 are people that had the ETE as part of their policy, because you don't have to have ETE, correct?

1          MR. OCHROCH:  Correct.  They -- they -- they --

2          THE COURT:  You pay more to have ETE.

3          MR. OCHROCH:  Correct.

4          THE COURT:  Correct.

5          MR. OCHROCH:  They -- they -- they -- they were

6   insured by Travelers.

7          THE COURT:  Um-hum.

8          MR. OCHROCH:  They had rental coverage.

9          THE COURT:  Right.

10          MR. OCHROCH:  Up to 30 days.

11          THE COURT:  Right.  They had an accident.

12          MR. OCHROCH:  And they got in an accident and the car

13   was totaled.  That's all -- that's the only qualification

14   for --

15          THE COURT:  Okay.  So that's --

16          MR. OCHROCH:  -- them to be in the class.

17          THE COURT:  So you're not dealing with somebody who

18   had a car repair?

19          MR. OCHROCH:  Correct.  No repairs.

20          THE COURT:  So these are all totaled cars?

21          MR. OCHROCH:  Right.  Who would've been treated the

22   same.  Mr. and Ms. Stechert were typical of that, because

23   that's the clause that says, if it's totaled, we get to

24   terminate the rental within five days.

25          THE COURT:  Okay.

1          MR. OCHROCH:  And that's the operative language

2     that's the center of the lawsuit.

3          THE COURT:  Okay.

4          MR. OCHROCH:  Those -- those are all people that fit

5     within that class.  And, again, it's to be updated, so it will

6     be something more than that.

7          THE COURT:  Well, I mean, this isn't really for you,

8     and I know this is, you know -- but the fact is, part of the

9     settlement is that Travelers has agreed to come up with some

10    new language, correct?

11         MR. OCHROCH:  Correct.

12         THE COURT:  For the rental letter, I suppose?

13         MR. OCHROCH:  Correct.

14         THE COURT:  And have they started to use that new

15    language?

16         MR. OCHROCH:  My understanding -- you -- and you --

17    you have what's sent to you earlier, I think, in camera,

18    correct?  Did you get that?

19         THE COURT:  Yeah.  I have it.

20         MR. OCHROCH:  My --

21         THE COURT:  Got another question about that, but it's

22    not really for you.

23         MR. OCHROCH:  My understanding, they have started to

24    use it, but, of course, nothing prevents them from

25    discontinuing it unless until, respectfully, you sign the

preliminary approval.  Then -- then they can't change their

mind.  But my understanding is that Travelers has absolutely

ordered everybody to stop using the rental letter.  Whether or

not they have -- whether or not they have fully implemented the

new procedures or they're waiting for your order, I do not

know.

THE COURT:  Okay.  But let's assume, and we'll hear

more about this in a minute, but if they have started to use

it, then you're not going to be increasing, because from

certain date on, if they're using the new policy, you're not

adding to your numbers of claims is what I'm saying.

MR. OCHROCH:  That's a good question, Your Honor.

THE COURT:  Well, I appreciate you saying it's a good

question, but to me it's just obvious.  I mean, if the policy

is in place, then --

MR. OCHROCH:  I -- I guess if the policy is in place,

and if, in fact, they have started to use it, then the cutoff

date would be when they started to use it as opposed to your

preliminary order.

THE COURT:  Right.

MR. OCHROCH:  Okay.

THE COURT:  Okay.

MR. OCHROCH:  That sounds fair.  That sounds -- and I

had not thought of that, but that sounds fair.

As part of the settlement, the class -- and this

1   is -- this is -- I can direct you to a page number, but there

2   are four -- four buckets, if you will.

3   THE COURT:  One, nine, sixteen, twenty-six range.

4   Eight, fifteen, twenty-five, thirty?

5   MR. OCHROCH:  Yes, I think that's correct.

6   THE COURT:  $300, $200, $75, $30?

7   MR. OCHROCH:  Correct.

8   THE COURT:  Tell me about those.

9   MR. OCHROCH:  Okay.

10  THE COURT:  So if I had -- what you're saying, I had

11  a total loss and I got a rental car somewhere between one and

12  eight days, is that the idea?

13  MR. OCHROCH:  Correct.

14  THE COURT:  And that's what I actually did get from

15  Travelers?

16  MR. OCHROCH:  You got -- you would get -- Travelers

17  gets a credit for -- what -- what you got and what they paid

18  for, they get a full credit for.

19  THE COURT:  Travelers does?

20  MR. OCHROCH:  I beg pardon?

21  THE COURT:  Travelers gets a full credit?

22  MR. OCHROCH:  I'm sorry, Judge.

23  THE COURT:  Travelers gets the full credit?

24  MR. OCHROCH:  Travelers.

25  THE COURT:  Okay.

1          MR. OCHROCH:  What did I say?

2          THE COURT:  All right.  Well, just walk me through

3     it.

4          MR. OCHROCH:  Okay.  Okay.  Travelers gets a credit

5     for that, which means that the people were -- were deprived of

6     the full policy limits and which point they get another $300,

7     which represents approximately a third of the full policy

8     limits.  They get the maximum negotiated settlement.

9          THE COURT:  Well, let me just -- let's just talk

10    about this.  So if, for instance, I had a vehicle, was insured,

11    I have a total loss.  This range of one to eight means that I

12    -- they did pay for a rental car for about eight days, right?

13         MR. OCHROCH:  Between one and eight days.  Correct.

14         THE COURT:  Okay.  Despite the policy -- despite this

15    rental policy letter saying five days?

16         MR. OCHROCH:  Right.

17         THE COURT:  So they went ahead and gave it to me for

18    eight days --

19         MR. OCHROCH:  Correct.

20         THE COURT:  -- but my insurance said I could have it

21    up to 30 days, and at day eight, I didn't have my new car to

22    replace my total loss, correct?

23         MR. OCHROCH:  And they didn't do the analysis

24    required.

25         THE COURT:  And they didn't do the analysis required

1  and whatever.  So, at that point then, I'm going to get paid

2  $300, so -- because, technically, I had another 22 days I might

3  have needed to get my new car, right?

4          MR. OCHROCH:  Correct.

5          THE COURT:  And so if we do the math, 22 times -- if

6  you're saying it's $30 today, so is it basically about $660

7  that they might have expended to me, but I'm going to get $300

8  credit?

9          MR. OCHROCH:  That's correct.  That's part of the

10  compromise.

11          THE COURT:  Okay.  And then that's the same -- you're

12  doing the math as it goes forward.  And you're saying most

13  people are in that very first category?

14          MR. OCHROCH:  That seems -- yeah, we do have those

15  numbers.  That's correct.

16          THE COURT:  And I think there's like -- there's a

17  percentage in here somewhere that I saw.

18          MR. OCHROCH:  Right.  Most people in the first two

19  categories.

20          THE COURT:  Okay.

21          MR. OCHROCH:  Mr. --

22          THE COURT:  All right.

23          MR. OCHROCH:  Mr. Stechert, interestingly enough, and

24  Mrs. Stechert are in the third category.  They got 22 days, so

25  they -- they will get a check for --

1          THE COURT:  Well, they're not quite in the third

2   category, because of the incentive award, so we're going to

3   talk about that in a minute.

4          MR. OCHROCH:  Okay.

5          THE COURT:  All right.

6          MR. OCHROCH:  But -- but according to this, they

7   would only get $75.

8          THE COURT:  Okay.

9          MR. OCHROCH:  Okay.

10          THE COURT:  Because he went back and negotiated with

11  them and said, no, I need the car for longer, and they did go

12  ahead and give it to him for a little bit longer, but it still

13  wasn't enough time --

14          MR. OCHROCH:  Correct.  He --

15          THE COURT:  -- and certainly didn't get to that 30

16  day period.

17          MR. OCHROCH:  The underlying testimony was he begged.

18          THE COURT:  Okay.

19          MR. OCHROCH:  Begged.  Repeatedly begged and -- and

20  was very upset.

21          THE COURT:  And how long did he get the car, then,

22  for, somewhere between 16 and 25?

23          MR. OCHROCH:  Twenty-two.

24          THE COURT:  Twenty-two days.

25          MR. OCHROCH:  Twenty-two days.

1          THE COURT:  Okay.

2          MR. OCHROCH:  So, again, this is -- this is money

3   -- Travelers has budgeted approximately 3.4 million dollars for

4   these categories, subject to being increased after the

5   preliminary order is entered and perhaps subject to the

6   reduction that you -- you just brought up, but that money

7   -- the -- the additional people will not be paid from the 3.4

8   million additional money pursuant to this system will be added

9   for the additional people, however many there are.

10         THE COURT:  Wait a minute.  Run that by me.  I don't

11  understand.

12         MR. OCHROCH:  Okay.  All right.

13         THE COURT:  What is -- additional people from this

14  approximate 17,000?

15         MR. OCHROCH:  No, over and above the 17,000.

16         THE COURT:  Right.  Over and above the 17,000 is not

17  from the 3.4 million?

18         MR. OCHROCH:  Correct.  The additional money will be

19  added --

20         THE COURT:  Okay.

21         MR. OCHROCH:  -- for them pursuant to the same

22  categories.

23         THE COURT:  Okay.  I understand what you're saying

24  then.

25         MR. OCHROCH:  So, in other words, the additional

1  people will not diminish the $300 due the first category.

2          THE COURT:  Okay.  And then explain to me what

3  happens with the unclaimed checks, because they're just going

4  back to Travelers?

5          MR. OCHROCH:  Okay.  First --

6          THE COURT:  Because there's no --

7          MR. OCHROCH:  Well, it -- remember, there's a claims

8  process.

9          THE COURT:  Right.

10          MR. OCHROCH:  Okay.  People have to answer three

11  questions.

12          THE COURT:  Right.  I understand.

13          MR. OCHROCH:  Either yes or I don't remember.

14          THE COURT:  Right.

15          MR. OCHROCH:  If they fill out the claims form, they

16  get a check.

17          THE COURT:  No matter what, even if they say, I don't

18  remember, because Travelers has already identified them as

19  somebody who falls in one of these categories?

20          MR. OCHROCH:  Correct.

21          THE COURT:  Okay.

22          MR. OCHROCH:  As long as they send the claims form

23  in --

24          THE COURT:  Got you.

25          MR. OCHROCH:  -- they get a check.  If -- if the

checks aren't cashed, there's a provision that allows us to
have them reissued, I think, within 180 days.

THE COURT:  Um-hum.

MR. OCHROCH:  There's a number of -- there's about
six best efforts categories in this agreement, which we like,
that -- that allows us to -- to, you know, track down people
that may have filled it out wrong, had a question, made a
mistake.  If you don't -- if you don't respond at all, you
don't get paid.

THE COURT:  Right.

MR. OCHROCH:  And that money remains with Travelers.
There's no side -- I -- I -- Mark Hanover, please correct me if
I'm wrong, but there's no side cy pres fund in this settlement.

THE COURT:  That's what -- that's what I saw.

Is that correct, Mr. Hanover?

MR. HANOVER:  Yes, that's correct.

THE COURT:  All right.  And that also goes through --
I -- I get the best efforts and all of that, we'll take another
try at finding people, new addresses and so forth, but it also
goes -- if, for some reason, there's a check out there that
never gets cashed, that money goes back to Travelers as well?

MR. HANOVER:  Yes --

THE COURT:  Okay.

MR. HANOVER:  -- Your Honor.

THE COURT:  Okay.

1          MR. OCHROCH:  Okay.  And, again, on the best efforts

2     clause, Your Honor, there's -- there's one close -- one -- one

3     quote that I'd like to read to you.  This is from ECF 51, page

4     33.

5          "It is the intent of the parties to make all

6     reasonable efforts to include for payment those class members

7     who file a claim or reach out and who are listed in Travelers'

8     records."

9          And there's six similar clauses for various

10    situations, including a clause that allows us as counsel to the

11    class to communicate directly with them.

12          THE COURT:  Um-hum.

13          MR. OCHROCH:  So Travelers and Epiq, who they've

14    designated as claims administrator, and -- and with our

15    assistance, will get copies of everything.  We're all going to

16    make our best efforts to try to maximize the number of people

17    that participate.  We don't want people to take the card and

18    throw it in the trash.  We can't help it, some will, but we're

19    going to try to minimize it.

20          THE COURT:  And how did you pick Epiq?

21          MR. OCHROCH:  I beg pardon?

22          THE COURT:  How did you pick Epiq?

23          MR. OCHROCH:  Travelers has had a relationship with

24    them -- or, rather, Mr. Hanover has a relationship with them

25    and he highly recommended them and we -- we accepted that.

1          THE COURT:  Okay.

2          MR. OCHROCH:  Okay.  The next part of the settlement,

3    which is the most important to Mr. Stechert is the change in

4    claims practices, and that's the Exhibit E that you received in

5    camera earlier today.  This is -- this is very important.  It's

6    very significant.  And, quite frankly, it's very unusual to

7    have an insurance company the size of Travelers to change its

8    claims policies, but they've agreed to do that as part of the

9    settlement.  It's designed to prevent again what happened here.

10          So, first and foremost -- excuse me, Your Honor, let

11   me have the exhibit.  I have another hard copy, Your Honor.

12   Would you like it?

13          THE COURT:  Of Exhibit E?

14          MR. OCHROCH:  Yes.

15          THE COURT:  No.  I have it right here.

16          MR. OCHROCH:  Okay.  What's significant about this

17   and what's -- well, there's a lot significant about this.  For

18   the first time, Travelers is now saying to their insureds,

19   please be aware that based on your policy language, our payment

20   for transportation expenses will be limited to that period of

21   time reasonably required to replace your vehicle.  That's what

22   it should have said from the beginning.  That's what it'll say

23   now.  That's very significant.

24          The -- the second paragraph is equally significant.

25   It sets a beginning and an ending date, which is fine, but it

1 also says, if you are unable to acquire a replacement vehicle

2 before the ending date, please contact me, the adjustor, to

3 determine how much time will reasonably be required to replace

4 your vehicle. That will, in our opinion, result in this

5 situation not happening again.

6      And, of course, the -- the other part of the change

7 in practices is the rental letter is banned from Travelers'

8 files. It's banned from their computers. Everyone has been

9 directed not to use it. We found in the underlying case that

10 some, not all, claims personnel and appraisers had it on the

11 computers and used it. It's been ordered off of everybody's

12 computers. As you may have seen in the settlement agreement,

13 it was a form letter; it was used, it will not be used again.

14 And that's -- that's -- that's -- that's critically important

15 to all of us, particularly the Stecherts.

16      The other significant part of this is there's no end

17 date. The clause in the settlement agreement that -- that

18 provides for this change in practices also provides that

19 unless, until there's a change in Travelers' policy and/or the

20 law, this will continue. They can change the policy language.

21 To my knowledge, so far they have not done so.

22      The other important aspect -- another important

23 aspect is that the policy release is not a claims release, is

24 not a general release. It is a release limited to ETE rental

25 benefits only. So personal injury benefits, liability

benefits, UIN benefits, none of that will be affected by this.

Time line. I'd like to talk about the time line a little bit, Judge, because it's -- it's -- it's necessarily complicated. The schedule by which the claims will be submitted and paid is contingent upon the dates of the preliminary hearing order and the date of -- and the scheduling of the final hearing. Those -- everything else works off of those dates. So, for example, and only by example, if -- if you entered the preliminary order today, that triggers an obligation from Travelers to -- to -- to have Epiq establish a website and a toll free number within 21 days. That also triggers another deadline of 45 days for Travelers to update the list and then within 75 days after that to begin sending the notices to all 18,000, however many numbers it is, members of the class.

And those forms, Judge, are Exhibit A and Exhibit C to the motion. Exhibit A is the claim form with the questions we talked about. Exhibit C is the notice that goes with the claim forms. All that goes out in -- in -- in 75 days, which in this case, if -- if your preliminary order went -- went out today, those claim forms would go out January 7th, 2022.

In the preliminary -- in the order that we have submitted to you at the top of the package, that we requested that you sign, the date of the final hearing is left blank. If -- what -- what we would recommend, and, of course, it's

1  subject to -- to -- to your discretion.  We would recommend a
2  final hearing date of June 3rd, 2022.  That means that the
3  final claim -- the claim forms are due within 45 days after
4  that or by July 18th, 2022.  And what that means is that if --
5  just by example, if the preliminary order was signed today,
6  people would have a little over six months to review the form,
7  call us, reach out to the website.  We could update the
8  addresses, if need be, and we would like -- we would like, if
9  it's okay with you and -- and Travelers, a period of six
10 months.

11         I don't want a situation where -- I don't want people
12 to throw these things out and I want time to be able to reach
13 out to them.  I want time for them -- time for them to -- to
14 reach out to us.  And I think that six months is -- is a very
15 fair period to -- to -- to do everything we can do to maximize
16 the participation.  But that's -- that's -- that's what's
17 interesting and complicated about this settlement.  Everything
18 is triggered off the preliminary order and the final hearing
19 date.

20         As I said and I can go through it, there are four or
21 five best efforts clauses; one for deficiency notices, one
22 where people are confused, inconsistent claim forms, uncured
23 default -- uncured forms.  We're permitted to communicate with
24 the class members.  Epiq will -- will -- Epiq and Travelers
25 will use their best efforts to update the list.  And as I said,

1  our -- our goal is -- is to work with Travelers and Epiq to

2  maximize -- maximize -- maximize the -- the amount of

3  participation.

4          As far as other requirements, I mean, again, the --

5  we believe it's fair, adequate, and reasonable.  As far as

6  numerosity, typicality, commonality as set forth in the -- in

7  the -- in the motion, I -- I think we've met all three.

8  Clearly have 18,000-plus people.  The Stecherts are typical of

9  everyone in the class, except somebody that -- somebody --

10 except that group that you brought up, which should be

11 excluded.  And there are common questions of law and fact.

12         It's been five years, bordering on six years of -- of

13 -- of contested, competent litigation.  Travelers hires good

14 lawyers.  They did -- they did a good job.  It's been hard-

15 fought litigation, but with your permission, we think it's time

16 to bring it to an end.  You know, accordingly, we would ask

17 that you enter the preliminary order at your earliest

18 convenience and -- and schedule the final hearing on a date

19 that will allow us to -- to get in touch with the -- with our

20 clients as necessary to encourage greater participation.  And

21 we do believe the -- we've met all of the fair, adequate, and

22 reasonable standards.

23         THE COURT:  I have a few -- are you finished?

24         MR. OCHROCH:  Yes.  No.

25         THE COURT:  I didn't want to interrupt you.

1        MR. OCHROCH:  Yes.  Yes, I am.

2        THE COURT:  All right.  So I have a few questions and

3 I will ask.  Does -- does Travelers plan on making any argument

4 or are you just going to answer whatever questions I might

5 have?

6        MR. HANOVER:  I -- I was prepared to answer any

7 questions the Court may have, Your Honor.

8        THE COURT:  Okay.  Great.  So let me first -- I'm

9 going to deal right now with Plaintiff's counsel.

10        So in terms of -- and I know, obviously, I'll have

11 another chance at this at the final hearing if I get to that

12 point, but I want to talk a little bit about the service fee or

13 the class representative fee; $20,000 for each seems really,

14 really high to me.

15        MR. OCHROCH:  Yes, Your Honor.

16        THE COURT:  Can you explain why that would be

17 justified in this particular circumstance?

18        MR. OCHROCH:  They spent a lot of time.

19        THE COURT:  Well, how much time?

20        MR. OCHROCH:  Five years.

21        THE COURT:  No.  Okay.  This has --

22        MR. OCHROCH:  They -- they --

23        THE COURT:  -- lasted for five years, but they didn't

24 spend 24/7 of five years.

25        MR. OCHROCH:  No.  No, they didn't.

1          THE COURT:  So --

2          MR. OCHROCH:  But -- but without them -- we're

3 changing the world a little bit for the best in the insurance

4 world.  It's an unusual case.  They stuck with us.  Mr. -- Mr.

5 Stechert was -- was more active than Ms. Stechert.  He read

6 everything that we sent him.  He asked good questions.  We

7 constantly communicated for five years, and -- and without him

8 we couldn't have done this.  And we are helping people that, a

9 lot of whom, don't know that they even needed help.  You know,

10 a lot of people if Travelers says you have to return the car in

11 five days, they return the car.  They -- they never knew there

12 was a misrepresentation of coverage, which is something that

13 insurance companies should never do.

14          Mr. Stechert and Mrs. Stechert each sat through a

15 deposition.  They answered interrogatories.

16          THE COURT:  How long were their depositions?

17          MR. OCHROCH:  One day for both.

18          THE COURT:  All day?

19          MR. OCHROCH:  I think all day for both.

20          MR. FOLAND:  A few hours, Your Honor.

21          MR. OCHROCH:  There was a Third Circuit mediation.

22 Mr. Stechert appeared in person as requested.  The case did not

23 settle.  He allowed me to file the appeal.  You know, his name

24 was on the case that could have been, you know -- some people

25 don't like having their names on cases, particularly cases that

1  are lost.  But he -- he believed in the cause and he allowed us

2  to -- allowed us to pursue it.

3        And, Judge, the -- we observed the Rules strictly

4  particularly under Judge Welsh's purview, and we will ask her

5  to write a letter.  We spent most of our time negotiating the

6  terms of the settlement before we talked about counsel fees and

7  before we talked about the -- the incentive fees.  Thereafter,

8  we then talked about the -- the incentive fees, but because

9  this is -- there's a fee shifting statute here, and this is

10  very important, this money is not coming from the class.  Our

11  fees and the Stecherts' fees are separate and apart because we

12  had allegations of bad faith under 8371, which the Third

13  Circuit did not permit us to proceed on.  So this money is

14  coming from Travelers' pocket to the Stecherts' pocket.  It's

15  not coming from the class members.

16        So under those circumstances, I would respectfully

17  suggest that it's -- it's well-earned.  They worked hard, and

18  it's not coming from the class.  That's the most important

19  part.  And other than that, it's entirely in your hands.

20        THE COURT:  All right.  And in terms of counsel fees,

21  have you -- can you talk about the lodestar method for me as to

22  the counsel fees?

23        MR. OCHROCH:  It will be based upon hours.  I have

24  not totaled up the hours in probably the last year.  There may

25  be some multiplying factor to it, but we will provide you with

1  detailed time records.  We have kept them, and we will provide

2  them and if we think a -- a multiplier is appropriate, we'll

3  make that argument at the time.  But everything will -- but the

4  base will be based upon hours, Judge.

5              THE COURT:  Okay.

6              MR. OCHROCH:  And, again, that's separate and apart.

7  Whatever you do with that, that money does not --

8              THE COURT:  I understand.

9              MR. OCHROCH:  -- go to the class.

10             THE COURT:  Okay.  Have there been some other cases

11 like this anywhere?

12             MR. OCHROCH:  Yes.

13             THE COURT:  Okay.  Where?

14             MR. OCHROCH:  We had a case like this in the Court of

15 Common Pleas with Mr. Brooks' firm about five, six years ago.

16             THE COURT:  ETE?

17             MR. OCHROCH:  ETE.  To what extent there's a

18 confidentiality agreement, I'm not sure, but there was a

19 similar case.  We went through a lengthy certification hearing,

20 and the case settled.  We --

21             THE COURT:  It was a class, though?

22             MR. OCHROCH:  It was a class.  There had been similar

23 cases throughout the country, not a lot, over the years.  But

24 in Pennsylvania, as far as I know, the only ones that have been

25 brought are the ones that we brought.  We also have another one

1  pending right now, again, in State Court in Philadelphia.

2          THE COURT:  But it's not ETE total loss?

3          MR. OCHROCH:  Same thing, no.  Total loss, ETE, car

4  rentals.  It's -- it's -- the language at issue is identical.

5          THE COURT:  So that case is going to go away if this

6  settlement happens?

7          MR. OCHROCH:  I don't know.

8          MR. HANOVER:  It's different -- excuse me.  It's

9  different insurance carriers, Your Honor.

10         THE COURT:  Oh, okay.  Okay.  Okay.  Okay.

11         MR. OCHROCH:  Oh, okay.  I'm sorry, Judge.

12         THE COURT:  Yeah, I was like --

13         MR. OCHROCH:  Different insurance company.

14         THE COURT:  I was like --

15         MR. OCHROCH:  The other two cases were different

16  insurance companies.

17         THE COURT:  Okay.

18         MR. OCHROCH:  Neither -- none of them were Travelers.

19         THE COURT:  Okay.  That makes more sense.  Okay.

20         And in any of those cases, did the insurance company

21  change their policy?

22         MR. OCHROCH:  In the first case, the one five years

23  ago, they did.

24         THE COURT:  So it's not that unusual, then?

25         MR. OCHROCH:  Okay.  Fair enough.

1          THE COURT:  I mean --

2          MR. OCHROCH:  They -- but they did only after the --

3          THE COURT:  Right.  I mean, when these things come to

4    light and an insurance company is going to agree to a

5    settlement of 3.4 million, I would think that they don't want

6    to risk it in the future.

7          MR. OCHROCH:  That case was also different.  There

8    were different -- because all cases are different.

9          THE COURT:  Right.

10         MR. OCHROCH:  There were different factual situations

11   there, and the settlement -- I can't recall all the details of

12   the settlement, but I know that that insurance company no

13   longer uses the rental letter.

14         THE COURT:  And do you know what the incentive awards

15   were in that case?

16         MR. OCHROCH:  I do.  I just don't know if there is a

17   confidentiality agreement.

18         THE COURT:  All right.  Well, why don't you go back

19   to your office and check, and if there isn't or you're allowed

20   to tell me that, I would like to know it.

21         (Attorneys confer.)

22         MR. OCHROCH:  Yeah, it was -- it was $25,000 for a

23   single plaintiff.

24         THE COURT:  Okay.

25         MR. OCHROCH:  Again, paid separate and apart, not

1  from the class funds.

2          THE COURT:  Same plaintiffs as in this case?

3          MR. OCHROCH:  Oh, no.

4          THE COURT:  Okay.  I wouldn't think so, but I just

5  wasn't sure.

6          Okay.  Then, I mean, how much did you -- in terms of

7  if this were to go to trial -- and I -- I understand that

8  there's -- you know, you think now is the right time to settle

9  this because of the uncertainty and so forth related to

10 everything, and it's been a hard-fought litigation.  But what

11 did you think the claims and other similarly situated

12 individuals were worth if this were to proceed to trial?  Were

13 you more on the bad-faith angle of this?

14         MR. OCHROCH:  The bad-faith angle was certainly a

15 component.

16         THE COURT:  Okay.

17         MR. OCHROCH:  It certainly was.  The -- the -- we

18 would have had a -- part of what appealed to us about this

19 settlement, a big part, was the inclusion of the 38 companies

20 and the 18,000 people.

21         THE COURT:  Okay.

22         MR. OCHROCH:  And the -- the change in behavior as

23 part of the settlement.  If I'm not mistaken, in our other

24 case, the change in behavior was something that occurred

25 because the company, for lack of a better term, after the

1  litigation changed their procedures.  It was not a requirement

2  of the settlement in that case.  It's a requirement of the

3  settlement in this case, and that's important.  So even if they

4  did change it, they -- you know, that's -- they could always

5  change it back.  Once you sign the order here, they can't

6  change it back.  And that's a big deal to us.

7           THE COURT:  Okay.  How many of these classes -- but I

8  don't know -- are actually in the Eastern District of

9  Pennsylvania versus Middle and Western?

10          MR. OCHROCH:  I don't know.  We have their -- we have

11 a printout of --

12          THE COURT:  Okay.

13          MR. OCHROCH:  -- 70,250 people.  We could -- we could

14 -- if we're permitted, we're happy to give you that printout or

15 we can -- we can analyze --

16          THE COURT:  That's okay.

17          MR. OCHROCH:  -- it ourselves.

18          THE COURT:  I just --

19          MR. OCHROCH:  But that I don't know.

20          THE COURT:  All right.  So in terms of the notice, I

21 -- it's long, but it is small print.  Do we -- I mean, do you

22 think it -- I don't know.  There is going to be a website,

23 right?

24          MR. OCHROCH:  Yes.

25          THE COURT:  Okay.

1            MR. OCHROCH:  And an 800 number.

2            THE COURT:  And an 800 number.  Okay.  How often --

3   when you have these, the 800 number, how often do people call

4   it?

5            MR. OCHROCH:  I don't know.  We've got a -- we got a

6   few calls in the last one, but not a lot.

7            THE COURT:  Yeah.

8            MR. OCHROCH:  I would, you know, defer to Mark

9   Hanover on that as well.

10           THE COURT:  People dial the 800 number, Mr. Hanover?

11           MR. HANOVER:  Yes.  I mean, it varies very much from

12  settlement to settlement.  My -- my entire practice is

13  defending putative class actions, and the amount that -- of

14  calls depends in -- on the complexity of the settlement, the

15  amount that's at issue, that may be recoverable for putative

16  class members.  When you're talking about hundreds of dollars,

17  that -- that often means an increased number of phone calls.

18  And the -- the ease or difficulty of making a claim also is --

19  affects the number of calls that are received.  Here, the --

20  this is one of the easiest claim forms that I've -- that I've

21  agreed to.  And -- and other people don't use the phones but

22  rather would just use self-service on the website.  There's

23  also -- I believe that Epiq has -- you can -- you can contact

24  Epiq through the website that they would setup --

25           THE COURT:  Well, since --

1          MR. HANOVER:  -- you know.

2          THE COURT:  -- you're talking about Epiq, tell me

3    about your relationship with them and how you suggested them to

4    plaintiffs' counsel for the provider in this case.

5          MR. HANOVER:  I think it's one of the largest class

6    action administrators in the country.  There are a few big

7    names.  There was Garden City, which was purchased by Crawford,

8    so now I guess it's known as Crawford, which is the -- one of

9    the big ones.  Epiq is one of the big ones.  KCC is one of the

10   big ones.  There's JND Legal.  I have use -- there was Rust.  I

11   have used most of them.  The -- the one that I've used the most

12   has been Epiq.  Some of my clients have actually preferred

13   provider agreements with them.  I don't think that Travelers is

14   one of them.  Epiq provides litigation support services.  They

15   have nothing to do with settlement.  This is one of their

16   lines.  If you Google them, you can see sort of a website with

17   a whole bunch of different services that they provide.  I know

18   that they've done -- this would be one of the smaller class

19   actions that Epiq would -- would ever get involved in, any --

20   with 17,000 or so putative class members.  Below this amount,

21   it probably wouldn't make sense to go with Epiq.  You might go

22   with a -- a small vendor.  I -- I personally have had

23   significant experience with them.  And I know that Travelers

24   has and several of my other insurance carrier clients have.

25          We -- we'd be happy to provide you further

1  information from them if you -- if Your Honor would like.

2       THE COURT:  No, that's -- I mean, that's helpful.

3  But just -- the only thing that -- the preferred provider

4  agreement, what would that be if you don't think Travelers has

5  that in this case?

6       MR. HANOVER:  Oh, well, I mean, so Travelers is --

7  the -- here, the defendant is paying the full cost to the

8  administration.

9       THE COURT:  Okay.  Right.

10      MR. HANOVER:  Which is -- which is common in these --

11 in these types of settlements, Your Honor.  So some of --

12 again, I don't think Travelers has it, but some insurance

13 clients use Epiq services for other purposes.  They might --

14 they might use them to help manage some of their internal like

15 database -- you know, litigation databases or litigation

16 support things.  And there's a procurement department that --

17 one of my clients has a procurement department where they

18 negotiate contracts with all third-party vendors.  And one of

19 the vendors that they have is Epiq.

20      And so there's a third-party contract that says that

21 they do any kind of, you know, administration work.  Here's the

22 rates that they'll -- that they'll charge or something like

23 that.  Again, I'm not aware that -- that Travelers has one.  I

24 just point that out to let you know that they're commonly used

25 in the industry.

1          THE COURT:  Okay.  And will there be -- I mean, I

2    assume there will be a way to fill out the form on the website.

3    Like you don't actually have to --

4          MR. HANOVER:  Yes, Your Honor.

5          THE COURT:  -- mail the thing back in.  You can

6    actually check the boxes -- yeah.  Okay.

7          MR. HANOVER:  That's correct, Your Honor.

8          THE COURT:  All right.  you know that in the note --

9    I mean, obviously, there's some fill in the blanks that you'll

10   have to do in this form anyway, but one is that you have Judge

11   Joyner and you'll have to change it to me, obviously.  I mean,

12   I don't know.  I -- I'm glad to hear that you say this is one

13   of the easiest one that you -- I do think it's fairly easy.  I

14   guess the only thing that -- and maybe it's just as I get older

15   I find smaller print harder to read.  I was able to read it,

16   but I'm trying to think if I got this in the mail, what I would

17   do with it.

18         MR. OCHROCH:  I don't know that the print would

19   actually be that small in the --

20         THE COURT:  Okay.

21         MR. OCHROCH:  -- final form, Mark.  Do you know?

22         MR. HANOVER:  No, I -- so what -- at this stage, Your

23   Honor, what you've seen is Mr. Ochroch and me put something --

24   just kind of whip something together between the two of us so

25   that we could show Your Honor the substance of what we have

1  agreed to.  If Your Honor approves -- or preliminarily approves

2  the settlement, then Epiq would do a publishing mockup, you

3  know, that would -- where they -- that Mr. Ochroch and I would

4  have to look at that would use this substance, and it would be

5  -- you know, it would -- it would use publishing stuff.  We

6  just put the substance into a -- you know, into an

7  eight-and-a-half by eleven piece of paper for you.

8          THE COURT:  Okay.  Because, I mean, with -- this is

9  getting sent out 75 days from the date of the entry of the

10 preliminary approval, correct?

11         MR. OCHROCH:  Correct.

12         MR. HANOVER:  Yes.  Yes, Your Honor.

13         THE COURT:  So I'm not going to see another -- I

14 mean, normally I see whatever is going to get sent out.

15         MR. OCHROCH:  We -- we can get a mockup to you ASAP,

16 Judge.  Happy to do that.

17         THE COURT:  Okay.  All right.

18         MR. OCHROCH:  We can do that.

19         THE COURT:  Okay.  And then --

20         MR. HANOVER:  Your Honor --

21         THE COURT:  Yes.

22         MR. HANOVER:  -- what I -- again, if there's further

23 questions, I would be happy to answer them.  There is -- there

24 is one comment that I had on something that Mr. Ochroch said

25 that I wanted to address affirmatively.

1          THE COURT:  Okay.  Go ahead.

2          MR. HANOVER:  I -- Mr. Ochroch suggested a final

3    approval -- a final hearing date, I think, in June.

4          THE COURT:  Yes.

5          MR. HANOVER:  -- which allows a six-month claimant

6    period.  I don't -- I've been looking back at the settlement.

7    I -- I think what I -- and I don't -- I don't see that we

8    actually specified the date.  Of course, the two of us can't --

9    Mr. Ochroch and I can't tell the Court what date.  I mean, this

10   is all up to the Court subject to the -- you know, what the

11   Court wants and the Court's availability.  But that would allow

12   -- a six-month claim date is quite long, and people don't

13   normally need that length of time.  I don't know that it would

14   actually benefit the putative class members.  It would just

15   delay any final payment if the Court issues final approval.

16         I would think that six months from today would give

17   -- if you -- if it was six months from today, I -- doing the

18   math in my head here, it looks like people would have about

19   four months to make a claim.  Generally, I -- you know,

20   anything three months or more is a acceptable.  So my own

21   proposal would be for -- if the Court -- subject to the Court's

22   availability, that we set something in April.

23         THE COURT:  Okay.

24         MR. OCHROCH:  Okay.  We'll -- that's fine with us,

25   Judge.

1            THE COURT:  Okay.  All right.  Well, let's -- all

2   right.  Just, I guess, briefly, for you -- I mean, whoever

3   wants to, I mean, I know you took, what, 11 depositions in this

4   case?

5            MR. OCHROCH:  Yes.

6            THE COURT:  Claims adjustors.  I mean, I guess it was

7   focused on, you know, how often they used this rental letter;

8   is that correct?

9            MR. OCHROCH:  Right.  The depositions started with

10  the claims process.  The original set of depositions before we

11  lost the motion for summary judgment was based upon what they

12  did in this particular case.  We didn't have -- it was not

13  class-wide discovery.  When it came back, then it was

14  class-wide discovery.  The procedures, in effect, for

15  everybody, there was a lot of depositions and a lot of -- well,

16  there was a lot of discovery.  I don't remember whether we got

17  to the depositions or not.  Only the --

18            THE COURT:  On the 38 entities?

19            MR. OCHROCH:  Pardon me?

20            THE COURT:  On the 38 entities?

21            MR. OCHROCH:  Yes.

22            THE COURT:  Okay.

23            MR. OCHROCH:  Yes.  I think that may have been when

24  the case settled.  So I'd have -- I can look, Judge.  I can

25  tell you who everybody is.

1          THE COURT:  And did the plaintiff attend all

2    depositions, in -- I mean, obviously, he -- he and she attended

3    their individual ones, but did they attend the other

4    depositions?

5          MR. OCHROCH:  No, Your Honor.

6          THE COURT:  Okay.

7          MR. OCHROCH:  Some of them were out of town, but the

8    answer is, no, they did not.

9          THE COURT:  All right.  Just give me one minute to

10   make sure I don't have any additional questions.  Oh, well,

11   then for Mr. Hanover, do you have a date of when they -- when

12   Travelers stopped -- or started to use the new policy?  Because

13   I do -- I mean, do you agree with me, that would be a -- your

14   docu -- there shouldn't be anybody since that date, correct, to

15   add to this?

16         MR. HANOVER:  So -- that's right, Your Honor.  So

17   what happened was this.  This has -- this has been --

18   procedurally, it's been a little bit unusual because what

19   normally would happen in most cases would be that the parties

20   would file for preliminarily -- preliminary approval, and a

21   ruling or -- a hearing or a ruling would occur roughly around

22   the same time.  Here, there was -- there was a longer period of

23   time because of various factors.  Travelers changed its

24   practices actually before preliminary -- before the plaintiff

25   -- before Mr. Ochroch moved for preliminary approval.  The

letter -- the rental letter that you have there, the bad rental

letter, the one --

THE COURT:  Uh-huh.

MR. HANOVER:  -- that is -- that was the instigator,

that was -- we attached to -- Mr. Ochroch's motion for

preliminary approval was a declaration from Travelers

explaining that we have rooted that out and destroyed it and it

no longer exists, and we have -- that letter is never being

used again.  And our practice has been to, you know, orally

explain to people how -- you know, how it is that we -- that we

do ETE coverage.

The new letter, I don't know that that has formally

gone into place yet because it was -- we were awaiting approval

from the Court.  Our practices have definitely changed.

There's no doubt that they've changed effective with

Mr. Stechert -- with Mr. Ochroch moving for preliminary

approval back in May.  But at the moment, I think, everything

is done orally.  I don't think we've started using a new letter

until we got approval from the Court.

THE COURT:  Oh --

MR. OCHROCH:  And that, I assume, Your Honor, also

means that the claims manual itself, it also had a clause about

five days, once the car damage was set, has not been eradicated

either, I assume, Mark.  That's -- that's -- I understand the

rental letter has been ordered trashed, but the other parts of

1 the -- of the conduct claims has not occurred yet, including

2 the change in the knowledge guide, or the guide that pertains

3 to Pennsylvania, to our knowledge.

4          MR. HANOVER:  So the -- the new letter becomes part

5 of the knowledge guide.  There -- to the extent there was any

6 reference to five days in the old knowledge guide, I don't know

7 whether that -- the status of that change.  I do know that the

8 practices, that Travelers made affirmative steps to ensure that

9 the practices were changed affirmatively going forward

10 effective when the motion for preliminary approval was filed.

11          THE COURT:  Well, that's the declaration that I have

12 on page 85 of 51-1, which is Hal Litvin, is that correct?

13          MR. HANOVER:  Yes.

14          THE COURT:  Okay.

15          MR. HANOVER:  That's right.  Mr. Litvin, correct,

16 Your Honor.

17          THE COURT:  So, I mean, it seems to -- I mean -- I

18 mean, you guys can discuss this after this hearing, but it

19 seems to me that if Travelers discontinued the use of the old

20 notice and took some affirmative step to notify everyone that

21 they are no longer doing that five-day -- whatever the date of

22 that notification was, then that would be the date that the

23 class, you know, ends, sort of, in terms of who gets added to

24 the class.

25          MR. OCHROCH:  We can discuss that, Your Honor.

1          THE COURT:  Okay.

2          MR. OCHROCH:  We can discuss that.

3          THE COURT:  All right.  Well, why don't you all

4   discuss that.

5          Let me just make sure.  And am -- is -- are

6   plaintiffs receiving -- you said they fall into the third

7   category?

8          MR. OCHROCH:  Yes.

9          THE COURT:  Are they receiving whatever amount that

10  is and the incentive award, or is -- or are they just getting

11  the incentive award and not getting that?

12         MR. OCHROCH:  We have not discussed it.  Presumably

13  it would be both.

14         THE COURT:  And I guess the way -- I mean, not to

15  upset Travelers at all, but if I'm -- if I'm looking at this

16  correctly, there could very well be people that are going to

17  get some sort of payment from Travelers even though they might

18  not have needed the car past whatever period of time?

19         MR. OCHROCH:  Correct.

20         THE COURT:  Okay.

21         MR. OCHROCH:  That was one reason Travelers very much

22  wanted the claims-made settlement.

23         Your Honor, may I ask a question?

24         THE COURT:  Yes.

25         MR. OCHROCH:  We're going to work up a notice form in

1 bigger type.  Do you want the claim form worked up as well?

2 They go together.

3          THE COURT:  Yes.

4          MR. OCHROCH:  Okay.  Thank you.

5          THE COURT:  And I'm just -- I was just looking at it

6 -- that was my perceptive in looking at it.  I was like, oh,

7 this -- I'm trying to see how well this is going to work in

8 terms of getting people to respond.

9          MR. OCHROCH:  that's a good thing.  We just focus so

10 much on the words going back and forth --

11          THE COURT:  Right.  No, I do --

12          MR. OCHROCH:  -- that we never --

13          THE COURT:  -- think it's in pretty plain English in

14 terms of understanding.  Though, I have to say that I -- it

15 took me a minute to walk my head through why I should get some

16 -- why the I don't remember gets me something.  But I

17 understand why it does.  I don't know if somebody who reads on

18 first glance is going to --

19          MR. OCHROCH:  I hope they pick up the phone and call.

20          THE COURT:  In this day of telemarketers, I found it

21 hard to believe I'm going to pick up the phone and call an 800

22 number, but maybe it's just me.  But I agree that you're doing

23 best effort in terms of the website, the first-class mail, and

24 an 800 number.  I don't know -- other than Instagram, I don't

25 know what else you can do.

1            MR. OCHROCH:  I don't know how to use Instagram.

2            THE COURT:  But Instagram might work.

3            MR. OCHROCH:  I'm afraid of Instagram.  I don't know

4    what it is, but -- I know what it is, and I'm afraid of it.

5            THE COURT:  You could -- you could target the

6    12-year-olds and say if you're parents have Travelers

7    insurance, make sure they read here.

8            MR. OCHROCH:  I don't want to do that.

9            THE COURT:  That would certainly be something new.

10           MR. OCHROCH:  Don't want to do that.

11           THE COURT:  All right.  All right.  Can you -- I

12   think I'm -- I think I'm finished, but I want to take a very

13   brief break and I'll be right back in in about two minutes.

14   Okay?

15           MR. OCHROCH:  Thank you, Your Honor.

16           THE COURT:  Thank you, all.

17           MR. HANOVER:  Thank you.

18           (Court in recess from 2:08 p.m. until 2:11 p.m.)

19           THE COURT:  -- you're going to meet and confer

20   regarding if you can come up with a different -- if there's a

21   different appropriate class -- if it's appropriate, if there's

22   a different class end date other than the date of my

23   preliminary order that I hopefully will be putting in place.

24   And then you also are going to give me, as soon as possible, a

25   markup of the notice and claim form with whatever corrections

1  need to be done.  Obviously, there will still be blanks for the

2  hearing dates and so forth.  And then I would like -- is there

3  any reason why I couldn't see the deposition transcripts of the

4  plaintiffs?  I'd like to have copies of the plaintiffs'

5  deposition transcripts.  That will help me down the road, I

6  think.

7          All right.  Is there anything else?  Because I think

8  you answered my question about the other case.  You got a nod

9  from somebody, so you answered that.  Is there anything else

10  that I've asked for that anybody thinks they need to get me?

11          MR. OCHROCH:  I don't think so.  We got to get you --

12  we're going to figure out when the end date should -- what the

13  end date should be.  We're going to figure out who should be in

14  the class.  We're going to give you mockups of the notice and

15  claim form.  And we're going to send you the transcripts of the

16  plaintiffs.

17          THE COURT:  Right.  Now, in terms of Exhibit E, I was

18  going to ask, to the -- I was under the impression that this

19  might be already -- obviously, you can tell.  I was under the

20  impression you might already been using it, Mr. Hanover,

21  Travelers.  And if it was, I was assuming that people are

22  getting this, you know.  So I was wondering why it needed to be

23  kept confidential.  Is there a need to continue to keep this

24  Exhibit E confidential at this point?  Oh, you're muted.  It is

25  weird, because usually you can see when somebody is muted.

1          THE CLERK:  He's still muted.

2          THE COURT:  Is he writing us a note and going to hand

3  -- I can't talk.

4          THE CLERK:  The old fashion way.

5          THE COURT:  Do you know the answer to my question?

6          MR. FOLAND:  I --

7          MR. OCHROCH:  He is writing a note.

8          THE COURT:  See.  Host is not allowing unmute.  That

9  would be you, Mr. Rafferty.

10          THE CLERK:  Let's see what we got here, Judge.

11          THE COURT:  That was good.  Give him a thumbs up

12  for --

13          THE CLERK:  He even wrote backwards.

14          MR. OCHROCH:  Did he write backwards?

15          MR. FOLAND:  Yeah.  That was good.

16          THE COURT:  He didn't have to write backwards, right?

17  No.  Yeah.

18          MR. OCHROCH:  I couldn't see --

19          THE COURT:  That would be really impressive.

20          MR. OCHROCH:  I couldn't see it.

21          MR. FOLAND:  I don't believe they're currently using

22  the -- the new letter, but I'll let Mark answer Your Honor.

23          THE CLERK:  There he is.

24          MR. HANOVER:  I'm on --

25          THE COURT:  All right.  Sorry about that, but that

1  was very good.  We definitely --

2          MR. HANOVER:  Yes.

3          THE COURT:  -- liked old school there.

4          MR. HANOVER:  Thank you, Your Honor.  So -- so I can

5  -- I can understand why looking at that letter you would find

6  there to be nothing confidential about it.  What we -- what the

7  company has is a claims adjustment manual that is

8  proprietary --

9          THE COURT:  Con -- okay.

10          MR. HANOVER:  -- and that it uses that it -- you

11  know, that it's competition sensitive.  You know, Travelers

12  believes that good claims service is good business and helps

13  repeat customers and stuff, and they worked long and hard to

14  preserve an entire sort of claims' manual.  This will become

15  part of it.  I certainly agree with you, Your Honor, that if

16  you look at this there doesn't seem to be anything

17  confidential.  And the whole idea is they're going to be

18  handing this letter to people, so it's not exactly like -- you

19  know, like, you know, the nuclear codes or something.  But we

20  -- but it would be Travelers' practice to keep the entirety of

21  the manual confidential.

22          THE COURT:  So you'd be better off if you actually

23  made it into a letter and gave it to me as a letter.

24          MR. HANOVER:  Yes.

25          THE COURT:  Okay.  Well, I mean, this is only --

because I guess this got filed from the docket without a

sealing motion, but it's redacted.  And I hate to say we have

to jump through -- through hoops, but that's what my concern

was, whether I have to actually enter a sealing order to keep

this redacted.

MR. OCHROCH:  I'll tell you, unless --

MR. HANOVER:  So, Your Honor, I believe that the

version that was filed was just the redacted version.  And then

we sent you, via email today, an unredacted version.

THE COURT:  Right, I know.  But the fact that the

redacted version was put on the file, I think -- it may make it

so I have to agree to that.  I mean, I know --

MR. HANOVER:  Okay.

THE COURT:  -- that's what you did, but I think,

technically, I need to agree.

MR. HANOVER:  Okay.

THE COURT:  But let me -- I will communicate with you

all and let you know what we need to do.  But if it -- if it's

something that we could put in a letter format and not -- but I

don't know if that would alleviate the concern or not.  Because

it's probably referenced in here, right, as that?

MR. HANOVER:  Yeah, I mean --

THE COURT:  It's referenced so you know what Exhibit

E is even if it --

MR. HANOVER:  Correct.

1           THE COURT:  Okay.

2           MR. HANOVER:  Correct, Your Honor.

3           THE COURT:  All right.  Well, we'll follow up if

4  there's anything more that you need to do related to that,

5  okay?

6           MR. HANOVER:  Okay.  Thank you.

7           MR. OCHROCH:  Thank you very much, Your Honor.

8           THE COURT:  All right.  All right.  Thank you, all,

9  for being here today, and good luck to everyone.  I'll see you

10  all soon.

11          MR. OCHROCH:  Thank you.

12          MR. FOLAND:  Thank you, Your Honor.

13          MR. HANOVER:  Thank you.

14          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

15          THE COURT:  Bye.  Thanks for being on Zoom.

16          MR. HANOVER:  Thank you.  Thank you.

17          (The proceeding concluded at 2:16 p.m.)

18                        *  *  *  *  *

19

20

21

22

23

24

25

**C E R T I F I C A T I O N**

I, Donna Morris, CET-1284, court approved transcriber, certify that the foregoing pages 1 to 28 is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

_____

DONNA MORRIS, CET-1284          DATE:  OCTOBER 25, 2021

* * * * *

**C E R T I F I C A T I O N**

I, Tami S. Mayes, CET-547, court approved transcriber, certify that the foregoing pages 29 to 53 is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

_____

COURT TRANSCRIBER          DATE: OCTOBER 25, 2021